193 Cal.App.3d 530 (1987)
238 Cal. Rptr. 363
WILLIAM J.G. PALMER, Plaintiff and Respondent,
v.
TED STEVENS HONDA, INC., Defendant and Appellant.
Docket No. H001189.
Court of Appeals of California, Sixth District.
July 10, 1987.
*532 COUNSEL
Myron Moskovitz, E. Day Carman and Carman & Mansfield for Defendant and Appellant.
Thomas R. Hogan, Paul A. Bruno, Patricia A. Martin and Thelen, Marrin, Johnson & Bridges for Plaintiff and Respondent.
*533 OPINION
AGLIANO, P.J. 

I

Introduction
Plaintiff William Palmer brought this action against Ted Stevens Honda, Inc. and others[1] to recover proceeds of $29,500 and punitive damages from the sale of his car on consignment. On October 30, 1982, he delivered his Ferrari on an oral consignment for sale to Donald Alvord, an employee of defendant. The car was not sold by a Stevens dealership, but was reconsigned to Ferrari of Los Gatos (FLG) and sold by FLG in late December 1982 or early January 1983. The proceeds were comingled with FLG's other assets when FLG filed for bankruptcy. On January 26, 1983, plaintiff made a written demand on Alvord and defendant for payment which defendant rejected, claiming the consignment had been with Alvord personally, as defendant did not authorize Alvord to accept it.
Plaintiff simultaneously pursued recovery in FLG's bankruptcy proceedings, and in July 1983 received $13,000 from FLG in partial satisfaction of his claim. After this action was filed in February 1984, plaintiff received $5,141 more from FLG's bankruptcy proceedings in July and August 1984, leaving a balance owing of $11,359.
After four days of trial in July and August 1985, the court instructed the jury on fraudulent inducement and concealment, negligence, breach of oral contract, and bad faith denial of contract. The jury returned a general verdict in favor of plaintiff against defendant awarding $29,500 compensatory damages and $150,000 punitive damages.
Defendant appeals, challenging only the punitive damages award. We reverse due to the following erroneous evidentiary rulings. The trial court allowed plaintiff to introduce evidence of defendant's litigation tactics and his own attorney fees to prove bad faith, lack of probable cause, malice, or oppression. The trial court excluded from jury consideration plaintiff's recovery from FLG.

*534 II

Trial Evidence
In May 1979 Donald Alvord, then working for FLG, sold plaintiff a red 1978 Ferrari GTS for $42,000. In October 1982 plaintiff contacted Alvord when he decided to sell the car. At that time, Alvord was the used car manager and also a sales manager for defendant Ted Stevens Honda, and was authorized to buy cars for defendant, Stevens Pontiac-GMC, and Marin Honda. Alvord said he personally was not interested in buying the car, but that his employer would be.
They met on Saturday, October 30, 1982, at a Stevens Pontiac dealership in San Jose. As they test-drove the car, Alvord explained he was starting up an exotic car division for the Stevens group of seven car dealerships, of which he was the used car sales manager. Alvord said the most he was authorized to offer was $24,500 since it was the wholesale value according to FLG. Plaintiff said he wanted $29,500.
Alvord suggested he leave the car on consignment with defendant, explaining that the car would serve as an attraction. Plaintiff left the car with Alvord that day after they agreed plaintiff would be responsible for maintenance and repairs, and defendant would advertise and sell it, keeping anything over $29,500. Plaintiff gave Alvord a copy of the car's Florida registration and proof of insurance, but retained the title (the pink slip) as security, since Alvord said the car could not be sold without the title. Plaintiff resided in Florida but frequently visited San Francisco on business.
As Alvord gave plaintiff and his fiancee a ride to the airport, he explained they would first show the car at a Stevens dealership in Los Gatos, and if it did not sell, then at a Stevens dealership in San Rafael.
Alvord first informed plaintiff the following week by a call to Florida that defendant could not sell the car without California emission controls. Plaintiff had had the smog system removed soon after buying the car to improve its performance. Plaintiff agreed to pay the $800 cost of having the smog system reinstalled. There was a conflict in the testimony whether plaintiff's car was shown on defendant's lot.
On December 4, 1982, Alvord made a written consignment of the car to FLG for a net sale price of $32,000 to the consignor.
On December 22, 1982, when Alvord returned plaintiff's call from Florida, plaintiff's fiancee said they had decided not to sell the car. Alvord told her it had already been sold subject to financing which did not appear to be *535 a problem. Alvord called plaintiff on December 28 to say financing was completed, so plaintiff should send the title, which he did. The smog control work was said not to be required because a car had been taken in trade.
Alvord did not wire the proceeds to plaintiff's San Francisco account as promised. Plaintiff made a number of unsuccessful attempts to contact Alvord before reaching him on January 6, 1983, when plaintiff first learned that FLG had sold the car and had not paid Alvord due to financial problems. Plaintiff retrieved the title from Alvord, who had retained it because FLG had not paid him for the car.
Brian Burnett of FLG returned plaintiff's call a few days after January 6, 1983, and acknowledged FLG owed plaintiff the money. Alvord stopped working for defendant in 1984.
Defendant's position at trial was: Ted Stevens denied defendant had a contract with plaintiff; it claimed the consignment contract with defendant was conditional on the car passing smog and safety checks, which it did not do; plaintiff refused to fund reinstallation of the smog equipment and authorized Alvord personally in early November 1982 to sell the car any way he could.
Plaintiff was permitted to testify, over objection, that in two and one-half years of litigation preceding the trial in July 1985, he had fought sixteen law and motion matters, tying one and winning the other fifteen, three with sanctions, at a cost of some $56,000 in attorney fees. In his opinion, defendant was "stone-walling" him.

III

Predicates for Punitive Damages
The jury was instructed that it could award punitive damages (Civ. Code, § 3294) if defendant caused plaintiff actual damage and was guilty of oppression, fraud or malice. (See BAJI No. 14.71.) The jury was further instructed that an employer who authorized or ratified an employee's acts could be liable for punitive damages.[2]
*536 (1) On appellate review of the sufficiency of the evidence, we resolve factual conflicts and draw inferences in support of the verdict. (Treadwell v. Nickel (1924) 194 Cal. 243, 260 [228 P. 25]; Crawford v. Southern Pacific Co. (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; Estate of Teel (1944) 25 Cal.2d 520, 526-527 [154 P.2d 384].) We assume a general verdict has resolved all issues in favor of the prevailing party, and will affirm it so long as one valid theory submitted to the jury is supported by substantial evidence. (Crosett v. Whelan (1872) 44 Cal. 200, 203; Estate of Hellier (1914) 169 Cal. 77, 83 [145 P. 1008]; Nunneley v. Edgar Hotel (1950) 36 Cal.2d 493, 501 [225 P.2d 497]; Posz v. Burchell (1962) 209 Cal. App.2d 324, 335-338 [25 Cal. Rptr. 896] and cases there cited; Everett v. Everett (1984) 150 Cal. App.3d 1053, 1063-1064 [201 Cal. Rptr. 351].) Reversal is required only when an error probably affected every theory of recovery. (Cf. Oettinger v. Stewart (1944) 24 Cal.2d 133, 140 [148 P.2d 19, 156 A.L.R. 1221]; Huebotter v. Follett (1946) 27 Cal.2d 765, 770 [167 P.2d 193]; Henderson v. Harnischfeger Corp. (1974) 12 Cal.3d 663, 670-671 [117 Cal. Rptr. 1, 527 P.2d 353].)
We presume the jury followed the court's instructions (Stanton v. French (1891) 91 Cal. 274, 277-278 [27 P. 657]; McClung v. Moore (1902) 138 Cal. 181, 182 [71 P. 98]; Zuckerman v. Underwriters at Lloyd's (1954) 42 Cal.2d 460, 478-479 [267 P.2d 777]), so the punitive damages award reflects an implied finding of an underlying tort plus fraud, malice, or oppression. (2) The punitive damages theory cannot be predicated on the breach of contract cause of action without an underlying tort. (Chelini v. Nieri (1948) 32 Cal.2d 480, 486-487 [196 P.2d 915]; Crogan v. Metz (1956) 47 Cal.2d 398, 405 [303 P.2d 1029]; Ericson v. Playgirl, Inc. (1977) 73 Cal. App.3d 850, 854 [140 Cal. Rptr. 921, 96 A.L.R.3d 427]; Quigley v. Pet, Inc. (1984) 162 Cal. App.3d 877, 887 [208 Cal. Rptr. 394].) Neither evidence of mere negligence (Kendall Yacht Corp. v. United California Bank (1975) 50 Cal. App.3d 949, 959 [123 Cal. Rptr. 848]; see Nolin v. National Convenience Stores, Inc. (1979) 95 Cal. App.3d 279, 284-288 [157 Cal. Rptr. 32]) nor constructive fraud (Delos v. Farmers Insurance Group (1979) 93 Cal. App.3d 642, 656-657 [155 Cal. Rptr. 843], and cases there cited; Estate of Witlin (1978) 83 Cal. App.3d 167, 177 [147 Cal. Rptr. 723]; compare Day v. Rosenthal (1985) 170 Cal. App.3d 1125, 1160 [217 Cal. Rptr. 89]) will support a punitive damages award without a showing of the statutory fraud, malice, or oppression.
Thus, plaintiff's punitive damages award must stand either on his fraud cause of action or his bad faith denial of contract cause of action. In our view, defendant has identified errors in the admission of evidence which justify reversal of the punitive damages award on either theory.

*537 IV

Admission of Evidence of Defendant's Litigation Tactics
(3a) Plaintiff was permitted to testify over relevance objections, to the amount of attorney fees he had incurred in the course of 16 law and motion matters and to related monetary sanctions awarded against defendant. The jury was instructed that this evidence was relevant only to whether there was bad faith, lack of probable cause, malice, or oppression on defendants' part, and not to the amount of plaintiff's damages.[3]
The jury was instructed that tort liability could arise if defendant in bad faith and without probable cause denied the existence of a contract with plaintiff, pursuant to Seaman's Direct Buying Service, Inc. v. Standard Oil Co. (1984) 36 Cal.3d 752, 769 [206 Cal. Rptr. 354, 686 P.2d 1158]. Defendant strenuously questions whether its litigation tactics are at all probative of this tort, or of malice or oppression. While the essence of this tort is a defendant's "stone-wall" denial of the existence of a contract, neither Seaman's nor its progeny suggest that the very manner in which a defendant conducts its defense in the litigation can be further evidence of bad faith. (Wallis v. Superior Court (1984) 160 Cal. App.3d 1109, 1115-1119 [207 Cal. Rptr. 123]; Quigley v. Pet, Inc., supra, 162 Cal. App.3d 877, 881-885; Multiplex Ins. Agency, Inc. v. California Life Ins. Co. (1987) 189 Cal. App.3d 925, 928-930 [235 Cal. Rptr. 12].)
Plaintiff relies on White v. Western Title Ins. Co. (1985) 40 Cal.3d 870 [221 Cal. Rptr. 509, 710 P.2d 309], as authorizing introduction of such litigation activity. There, insureds prevailed against a title insurer on a cause of action for breach of the covenant of good faith and fair dealing implied in the contract. (Id., at pp. 885-889.) The title insurer had failed to discover a water easement on the insureds' property and then rejected their demand to be compensated for diminution of the property's value. (Id., at p. 878.)
The Supreme Court decided as a matter "of first impression" that the trial court had not erred in admitting evidence of the insurer's litigation *538 conduct to prove breach of the implied covenant. (Id., at p. 885.) The evidence included unfounded "nuisance-value" settlement offers made by the insurer. (Id., at p. 889.) The court reasoned "the contractual relationship between insurer and the insured does not terminate with commencement of litigation" (id., at p. 885); even where litigation arises between insurer and insured concerning coverage of one claim, the insurer is still obliged to perform its other contractual duties fairly and in good faith (id., at pp. 885-886); to permit the insurer to act as an adversary once litigation is filed would frustrate the "policy of encouraging prompt investigation and payment of insurance claims." (Id., at p. 886.)
The court further stated: "Defendant argues that imposing a duty of good faith after litigation has begun will make it difficult for the insurer to defend the suit. It claims that investigation of the factual circumstances would be hampered by an obligation to reveal to the insured any material facts it discovers favorable to his claim, and that the attorney who prepares the case for trial could not conduct the trial because he would be a critical witness to the insurer's good faith during the pretrial period. Neither of these concerns, however, justify a distinction between the period before suit is filed and the period after it is filed. Certainly the insurer should have investigated the factual basis of the claim before suit is filed, and may well have utilized counsel to evaluate that claim. The issue of contractual liability can be tried separately, and prior to the trial on the good faith claim, as was done in the present case. In any event, what constitutes good faith and fair dealing depends on the circumstances of each case, including the stage of the proceedings and the posture of the parties. We trust that the jurors will be aware that parties to a lawsuit are adversaries, and will evaluate the insurer's conduct in relation to that setting. [Fn. omitted.]" (Ibid.)
Contrary to plaintiff's contention, while the insured was also allowed to prove "the attorney's fees paid and incurred in prosecuting the suit" (id., at p. 879), White did not treat the fees as evidence of the insurer's breach of the implied covenant. Instead, they constituted damages under Brandt v. Superior Court (1985) 37 Cal.3d 813 [210 Cal. Rptr. 211, 693 P.2d 796]. (Id., at p. 890.) Brandt held that as an element of damages for tortious breach of the implied covenant in an insurance contract, an insured could recover attorney fees expended in obtaining the denied benefit. (Brandt, supra, at p. 817.)
In our view, White is not controlling because its context was what the Supreme Court deemed a special relationship between insurer and insured. The court, in Seaman's, declined to extend the insurer's tort of breach of the implied covenant to "the ordinary commercial contract." (Seaman's Direct Buying Service, Inc., supra, 36 Cal.3d at p. 769.) Also, unlike White, there was no continuing contractual relationship between plaintiff and defendant in the instant case and therefore no implied covenant to treat plaintiff fairly *539 in other transactions. The only obligation defendant owed plaintiff under the consignment contract was to pay him once the car was sold. (4) (See fn. 4.), (3b) Accordingly, we reject the suggestion White be extended beyond the insurance setting for which the Supreme Court itself seems to have reserved it.[4]
More importantly, once litigation has commenced, the actions taken in its defense are not, in our view, probative of whether defendant in bad faith denied the contractual obligation prior to the lawsuit.
One significant defect in such evidence is that it holds the client responsible for the attorney's litigation strategy. While much of what an attorney does in litigation is contractually binding on the client (see Blanton v. Womancare, Inc. (1985) 38 Cal.3d 396, 403-405 [212 Cal. Rptr. 151, 696 P.2d 645, 48 A.L.R.4th 109]), where it is tortious the client is not vicariously liable merely for retaining the attorney who is an independent contractor. (Lynn v. Superior Court (1986) 180 Cal. App.3d 346 [225 Cal. Rptr. 427]; cf. Merritt v. Reserve Ins. Co. (1973) 34 Cal. App.3d 858, 880-882; [110 Cal. Rptr. 511] but see Rest.2d Agency, § 253; Clark v. Andrews (1952) 109 Cal. App.2d 193, 199 [240 P.2d 330].) The client is insulated from tort liability for the attorney's litigation conduct on his behalf where "[t]here is no showing ... of ratification or any other act by [the client] endorsing or approving the attorney's actions." (Lynn, supra, at p. 348.) Defendant accurately contends "there was no evidence that Mr. Stevens or anyone else at Honda was actively involved in the pretrial litigation decisions of [defendant's] trial lawyer...."
Plaintiff points to Commercial Cotton Co. v. United California Bank (1985) 163 Cal. App.3d 511, 515 [209 Cal. Rptr. 551, 55 A.L.R.4th 1017], where the bank was held liable for an unreasonable position taken by its general counsel. However, that opinion did not consider as an issue whether this imputation of liability was appropriate. Opinions are not authority for issues they do not consider. (Hart v. Burnett (1860) 15 Cal. 530, 598-600, 603-604; Maguire v. Hibernia S. & L. Soc. (1944) 23 Cal.2d 719, 730 [146 P.2d 673, 151 A.L.R 1062]; Brokopp v. Ford Motor Co. (1977) 71 Cal. App.3d 841, 851 [139 Cal. Rptr. 888, 93 A.L.R.3d 537].)
*540 Plaintiff also contends Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc. (1986) 42 Cal.3d 1157 [232 Cal. Rptr. 567, 728 P.2d 1202] authorizes consideration of an attorney's litigation tactics as proof of an underlying intent. (Id., at p. 1168.) However, the attorney there was the defendant and the issue was whether he had the requisite intent for abuse of process. (Id., at p. 1161.) The opinion does not consider whether the attorney's intent may be imputed to the client.
Another problem with the admission of such evidence is that it fails "to consider or accord any weight to the right of a defendant to defend itself." (White v. Western Title Ins. Co., supra, 40 Cal.3d 870, 895, Lucas, J. dissenting.) A party who denies a contract's existence will be disabled from defending himself if his discovery tactics are used as evidence of preexisting bad faith. Litigation is governed by a different set of rules. It is for the law-and-motion judge and not the jury to assess whether a party should be penalized for bad faith discovery positions. (Ibid.)
We determine for even more compelling reasons that the amount of attorney fees charged plaintiff by his own counsel for such law and motion proceedings is completely irrelevant to defendant's state of mind.
Not only was admission of this evidence of defendant's litigation conduct and plaintiff's attorney fees error, we conclude it undermines the integrity of the punitive damage award. The jury was instructed to consider in arriving at a punitive damage award "[t]he reprehensibility of the conduct of the defendant." Plaintiff's closing argument relied heavily on this improper evidence in requesting punitive damages. The jury awarded punitive damages five times greater than compensatory damages. This ratio is some indication the award resulted from passion and prejudice. (See Allard v. Church of Scientology (1976) 58 Cal. App.3d 439, 453 [129 Cal.Rptr 797].)
Moreover, we are of the opinion that this improper evidence inflamed the jury so as to disregard the court's admonitions about its limited purpose, thus affecting the validity of the punitive damage award whether based on the fraud or the bad faith denial of contract cause of action.

V

Exclusion of Relevant Evidence
(5a) Plaintiff made a pretrial motion in limine to exclude evidence that he collected $18,141 from FLG. He acknowledged the amount should be set off against any favorable verdict. The trial court agreed to exclude this evidence on the ground reference to other proceedings would confuse the jury. (Evid. Code, § 352.)
*541 Krusi v. Bear, Stearns & Co. (1983) 144 Cal. App.3d 664 [192 Cal.Rptr 793], relied on by defendant and ignored by plaintiff, is instructive. There one stockbroker gave another its customer's stock as its own to discharge a debt. When the first broker went bankrupt, the second broker applied the proceeds of the stock against the debt of the first. The customer obtained compensation through the first broker's bankruptcy proceedings and successfully sued the second broker for conversion. (Id., at pp. 668-672.)
The appellate court upheld the trial court's deduction from plaintiff's verdict against the second broker of a payment out of a fund for customers of bankrupt stockbrokers. (Krusi, supra, 144 Cal. App.3d 664, 676-677.) The judgment was reversed, however, because the appellate court further determined that another payment out of the bankruptcy proceedings should be deducted from the general verdict (id., at p. 678) as should another type of payment from the first broker (id., at p. 675).
The court finally considered what effect this reduction of the compensatory damages award should have on the punitive damages award against the second broker. The court observed, "if the jury is not informed about the mitigation of plaintiff's actual losses, there is a strong likelihood that the jury will return an inflated award of punitive damages." (Id., at p. 681; italics in original.) Nevertheless, in light of cases authorizing exclusion of evidence of plaintiff's compensation by a joint tortfeasor (see Syverson v. Heitmann (1985) 171 Cal. App.3d 106, 110-111 [214 Cal. Rptr. 581] and cases there cited), Krusi only held that the trial court should have considered a punitive damages reduction on the broker's motion for a new trial. (Id., at pp. 680-681.) Defendant here likewise unsuccesfully moved for a new trial, claiming excessive damages, among other things.
Although Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc. (1984) 155 Cal. App.3d 381, 393-396 [202 Cal. Rptr. 204], has illustrated that there is no fixed ratio between actual damages and proper punitive damages, it remains the law, as the jury was instructed here, that any punitive damage award "must bear a reasonable relation to the actual damages." (BAJI No. 14.71; Liodas v. Sahadi (1977) 19 Cal.3d 278, 284 [137 Cal. Rptr. 635, 562 P.2d 316]; Rosener v. Sears, Roebuck & Co. (1980) 110 Cal. App.3d 740, 751-752 [168 Cal.Rptr 237].) A jury cannot properly obey this instruction when evidence of plaintiff's actual damages is excluded. We agree with Krusi's above-quoted observation, but believe it follows that when the amount of punitive damages is in issue, evidence of money paid to plaintiff on account of the debt is highly relevant and should be admitted to inform the jury of plaintiff's true loss.
Since "`[d]eterminations related to assessment of punitive damages have traditionally been left to the discretion of the jury'" (West v. Johnson & *542 Johnson Products, Inc. (1985) 174 Cal. App.3d 831, 867 [220 Cal. Rptr. 437] and cases there cited; cf. Devlin, supra, 155 Cal. App.3d 381, 387-388), we hold that the jury should have been apprised of this evidence relevant to plaintiff's actual damages in order to guide its determination of a reasonably related amount of punitive damages. It is so probative its exclusion cannot, under these circumstances, have been justified under Evidence Code section 352.
"(6) Whether the trial court's error constitutes grounds for reversal depends on whether the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; Evid. Code, § 354.) ... "[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (Clifton v. Ulis (1976) 17 Cal.3d 99, 105-106 [130 Cal. Rptr. 155, 549 P.2d 1251]; cf. Code Civ. Proc., § 475; Seaman's Direct Buying Service, Inc., supra, 36 Cal.3d 752, 770.) (5b) We note that the exclusion of this evidence enabled plaintiff to assert in opening argument that "defendants deprived [plaintiff] of his car and the proceeds from the sale of his car ... and gave him nothing" and in closing argument to ask for $29,500 in compensatory damages. We consider it reasonably probable that a smaller punitive damage award would have resulted from admission of the improperly excluded evidence of plaintiff's actual damages.

VI
We reverse the judgment for retrial of the issue of plaintiff's entitlement to punitive damages. Defendant is entitled to its costs on appeal.
Brauer, J., and Capaccioli, J., concurred.
BRAUER, J., Concurring.
The lead opinion makes clear that White v. Western Title Ins. Co. (1985) 40 Cal.3d 870 [221 Cal. Rptr. 509, 710 P.2d 309] applies only to insurance companies. White, as the dissents in that case pointed out, seriously compromises the right of those enterprises to defend themselves in court. I hope our Supreme Court will find an early opportunity to reexamine that decision.
NOTES
[1] Donald Alvord and Stevens Pontiac-GMC, Inc. were also named defendants, but we will refer only to Ted Stevens Honda, Inc., the sole appellant, as defendant.
[2] "Punitive damages may be awarded against an employer for acts of the employee, only if: [¶] The employer had advance knowledge of the unfitness of the employee and with a conscious disregard of the rights and safety of others employed that person, or the employer authorized or ratified the conduct which is found to be the basis for punitive or exemplary damages. [¶] If the employer is a corporation, the advance knowledge and conscious disregard, authorization, ratification, or act of oppression, fraud or malice must be on the part of an officer, director, or managing agent of the corporation." (BAJI No. 14.73.) It is unclear whether BAJI No. 14.74 was given.
[3] The jury was instructed: "Certain evidence has been admitted regarding the attorneys' fees paid by plaintiff in this action. You are to consider this evidence as evidence of malice or oppression, if any, on the part of defendants and as evidence of bad faith and lack of probable cause, if any, on the part of defendants. [¶] You are instructed not to consider this evidence of attorney's [sic] fees as evidence of Mr. Palmer's recoverable damages." A similar admonition was given when the evidence of attorneys' fees was first admitted.

The jury was further instructed: "Certain evidence has been entered regarding the number of pre-trial motions, sanctions that have been awarded by the Court against defendants, and the time required to bring this case to trial. This has been admitted as evidence of defendants' malice or oppression, if any, and as evidence of bad faith and lack of probable cause, if any. [¶] You are instructed to consider this evidence for those purposes only."
[4] Plaintiff seeks another such extension by contending, without cross-appealing, that the trial court erred in denying him recovery of attorney fees expended in this action as an element of damages for bad faith contract denial. We regard the Brandt rule as confined to the special insurer-insured relationship, and do not think bad faith in disputing an ordinary commercial obligation can overcome the general rule of nonrecovery of attorney fees in the absence of a contrary agreement. (Code Civ. Proc., § 1021; accord Fuhrman v. California Satellite Systems (1986) 179 Cal. App.3d 408, 426-428 [231 Cal. Rptr. 113].)

This question is different from whether plaintiff is entitled to recover his attorney fees in the bankruptcy proceedings as damages under the tort-of-another theory. (E.g., Moe v. Transamerica Title Ins. Co. (1971) 21 Cal. App.3d 289, 302-303 [98 Cal. Rptr. 547].)